## Case No. 8,486.

### In re LONGFELLOW et al.

[2 Hask. 221; [1] 17 N. B. R. 27.]

District Court, D. Maine. Jan., 1878.

BANKRUPTCY—ASSETS—INCUMBERED LANDS—PAYMENTS—TO WHOM CHARGEABLE.

1. Assets from the sale of incumbered lands of a bankrupt should be applied to extinguish the incumbrances in the order of their priority.

2. When incumbrances have been paid upon a particular parcel of land for the benefit of subsequent grantees of different interests in the same, the sum so paid is chargeable, in the inverse order of alienation, to the most recently acquired interest.

Petition by assignees [of E. Longfellow & Sons, bankrupts] to be reimbursed out of the proceeds from the sale of incumbered lands for sums paid to save the same from forfeiture.

H. L. Mitchell, for assignees.

George Walker and William H. McCrillis, for claimants of the fund.

FOX, District Judge. This is a petition by the assignees that the sum of $4028, paid by them by leave of court from the general assets of the estate to redeem the right in equity of redeeming certain timber lands, may be repaid from the amount received from the sale of said lands, and now in the hands of the court.

The petition in bankruptcy was filed against the bankrupts, December 20, 1873, and at that time the lands in question, being a portion of township No. 4, in the Bingham lands in Hancock county, were subject to various incumbrances, the right of redemption being in the bankrupts.

Four of these incumbrances are alone involved in this investigation: I. A mortgage to Amos F. Parlin with covenants of general warranty, dated October 15, 1869, and recorded the same day. It is conceded by all parties that Parlin's rights under this mortgage are paramount to those of all other parties, and that he must first be fully paid from the proceeds of the land; nothing further need be said in relation thereto. II. A conveyance to Shaw Brothers, by deed of general warranty, of all the hemlock timber on the premises, dated April 15th, 1871, and recorded April 20th. III. A release and quitclaim to Peters & Co., dated January 12, 1872, accompanied by a bond of defeasance on payment to them of the bankrupts' indebtment, and which together constituted and were equivalent to a mortgage of the premises.

Prior to the deed to Shaw Brothers, viz: On the 1st of December 1870, John Shaw attached, on a writ against the Longfellows, all their interest in the premises. This attachment was kept in full force, so that there was a lien upon the premises from the date of the attachment which accompanied the judgment, and a sale of all the right, title and interest of the Longfellows was made on the execution in Shaw's favor, December 20, 1873, subject to the right of redemption by the Longfellows, or their assigns, within one year from that date; if not so redeemed, John Shaw, who purchased this right at this sale, thereby acquired all the interests which the Longfellows had in the premises on December 1st, 1870, and Shaw Brothers and Peters & Co. lost all benefit and advantage by virtue of the conveyances to them after December 1st, 1870.

In August, 1874, the assignees commenced a bill in equity in this court against all of

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

these parties as well as certain others who claimed interests in the premises, to have their rights and the amounts respectively due to them ascertained and determined, praying for a sale of the premises in lots of 640 acres each, the proceeds to be deposited in court, subject to the rights and interests of the various parties.

It was averred that, by this method of sale, enough would be realized to pay all the incumbrances and leave several thousand dollars for the benefit of the unsecured creditors; but if the premises were sold as an entirety, subject to the various incumbrances, nothing would be realized for the benefit of the estate; each and all of the respondents protested against any sale of the premises which would in any way impair their security, or debar them from enforcing their just claim, or require them to receive any less amount than the sum justly due, or for any less amount than the legal and equitable lien thereon.

The parties not being able to agree upon the terms of sale, none was ordered until the final disposition of the cause, when the amount received was very much less than it would have been if a sale had been permitted according to the prayer of the bill in a reasonable time after it was filed, property of this description having greatly depreciated in value.

In December, 1874, prior to the expiration of the year for redemption, John Shaw notified the assignees, as well as Shaw Brothers and Peters & Co., that if the required amount to redeem was not paid to him before the year expired, he should, henceforth, insist upon his rights under the laws of Maine, and should claim the estate, and not allow either of the parties whose rights were acquired after December 1st, 1870, to redeem the property. Shaw Bros. and Peters & Co. were each ready and willing for their own purposes to redeem the premises from John Shaw, but were each unwilling that the other party should acquire John Shaw's title, being apprehensive that their own rights might thereby be endangered; and each party repeatedly applied to the assignees, urging them to redeem, as they held in their hands funds belonging to the estate sufficient for that purpose.

The assignees were alike unwilling thus to use these funds, excepting upon some agreement that it should be done for the common benefit of all parties interested, and in the course of the equity proceedings, as a charge upon the premises, to be refunded to the estate from the proceeds realized by a sale of the township. A petition was thereupon prepared by the assignees, somewhat loose and informal in its terms, which was presented to this court, December 8, 1874, for its sanction, representing that it would be for the best interest of the creditors to redeem the premises from the Shaw levy by payment of the amount due thereon. This petition was not filed under the provisions of general order 17, and the notice thereby required was not given; but it was rather in the nature of a proceeding in the equity cause, and notice was given only to the parties to said cause, as they were the only ones to be affected thereby.

Mr. McCrillis, counsel for Shaw Brothers, appeared with the counsel of the assignees before the court; and it was shown to the court that the counsel of Peters & Co., in their behalf, approved of the proceedings by the assignees that they should advance from the funds in their hands belonging to the estate the amount required, and the court thereupon, with the assent of all parties, authorized them to apply this amount for the time being for the benefit of the several parties interested in these premises, and to be benefitted by the removal of this incumbrance, all parties intending that, when the premises were sold, the amount should be restored to the general funds; that such was the purpose and intention of all these parties is manifest by the fact that the redemption was thus obtained at the intercession of Shaw Brothers and Peters & Co., and they thus became parties to, and approved of the plan, and requested the court to empower the assignees thus to use the funds of the estate.

If the redemption was only for the benefit of the unsecured creditors, the assignees had full authority to act in their behalf to redeem or not, as they saw fit, with the sanction of the bankrupt court, and parties who were interested in prior incumbrances could not in any way control such action of the assignees. Neither their assent nor their protest would avail to govern the assignees, if they were acting in behalf of the general creditors only; if the object and purpose of the assignees in redeeming the premises was merely for the advantage of the unsecured creditors, they would never have called upon Shaw Brothers and Peters & Co. to aid in the matter, appear before the court and request the court to authorize the assignees to redeem the property. The great interest they had at stake and their conduct throughout the affair should satisfy any one that they never contemplated the assignees were thus acting solely for the unsecured creditors; but the rather that they were making this advance temporarily from the funds in their hands as one step in the equity cause for the common benefit and advantage of all parties interested, to relieve from this incumbrance, the amount to be restored from the proceeds of the estate when realized.

Peters & Co. are the only parties who have derived any benefit from the redemption of the Shaw levy. If it had not been redeemed, they would have lost their entire claim in the premises; and by its payment their security has been saved, and a large amount, over and beyond that paid to Shaw, will be coming to them from the sale of the mortgaged estates, though not sufficient to satisfy their demand,

as the incumbrance was one which they necessarily must and would themselves have discharged, unless it had been done by the assignees at their request; and as they thus reap all the advantages therefrom, it would seem but equitable that they should allow the amount, which the assignees have thus appropriated for their sole benefit, to be returned from the proceeds of the sale of the premises to the fund from which it was thus withdrawn.

It is claimed in argument, that Peters & Co. might themselves have advanced the requisite amount to John Shaw, and have taken from him an assignment of his title, and that they would thereby have acquired an absolute title to the premises. If they, by so doing, could have acquired such a title, it is difficult to perceive what greater advantage they would have derived than they will have obtained by the assignees having paid the amount, if it shall be refunded to them from the proceeds of the sale. If Peters & Co. had paid it, they would have advanced just so much more money from their own means; they would have incurred this additional expenditure on account of the property, and in final settlement, after reimbursing themselves the amount paid by them to John Shaw, they would have realized no more than they will if the amount is repaid to the assignees.

But it cannot be admitted that a court of equity would have allowed Peters & Co., while a bill was pending for the adjustment and payment of all claims upon the property, by a purchase from Shaw to have acquired any absolute title under John Shaw to the exclusion of the assignees, or Shaw Brothers; if they had procured this title, the court in equity would have restricted the rights of Peters & Co. to a simple right of priority of payment, when the estate was sold, of the amount advanced therefor to John Shaw.

The assignees had by their bill in equity submitted to the court the determination of the rights in the premises of all parties, and had prayed for a license to sell the premises for the payment of these demands according to their priorities. The court, therefore, having the custody and control of the property with all parties present for a determination of their rights, would never have permitted one party, by acquiring any outstanding incumbrance, to defeat the purpose and object of the bill, and commit so gross a fraud upon all other parties by such a title acquired during the pendency of the cause. "Pendente lite nihil innovetur." It is also contended that Peters & Co. will be injured by the doings of the assignees, if they are required to allow this amount, as they are deprived of contribution from Shaw Brothers, whose title was also subject to John Shaw's claim for a proportion of the amount thus paid; but this, in my view, was not the true relation of these parties, as Shaw Brothers would not have been liable for contribution, if Peters & Co. had themselves redeemed the property from John Shaw.

The title of Shaw Brothers was to all the hemlock timber by deed of warranty, April 15, 1871, duly recorded. Peters & Co.'s title was subsequent, viz.: January 12, 1872, by quitclaim deed. Although John Shaw's title was prior to, and had precedence of both these parties, yet, as Peters & Co. acquired their title by quitclaim posterior to Shaw Brothers, it is well settled in this country, that, in such case, the parcel last sold is chargeable with the whole amount of the incumbrance, the rule being, that when lands subject to an incumbrance are sold to different parties at different times, those last sold are primarily liable to the payment of the incumbrance, which, although a lien on the whole, is chargeable on each parcel in the inverse order of its alienation.

I am aware that Judge Story in his Equity Jurisprudence (volume 2, § 1233a), questions this rule, and is of opinion that it is not in accordance with English authority; but his doubts have not been sanctioned by the American courts, with but one or two exceptions, and the rule is approved by a very large number of the most authoritative state tribunals. A few cases only need be cited. Wallace v. Stevens, 64 Me. 225; Lyman v. Lyman, 32 Vt. 79; Chase v. Woodbury, 6 Cush. 143; George v. Wood, 9 Allen, 80; Clowes v. Dickenson, 5 Johns. Ch. 235; [Courden's Estate, 1 Barr. (1 Pa. St.) 267].[2]

The same rule is laid down by the courts of New Jersey, Pennsylvania, Ohio, Georgia, Virginia, Alabama, Tennessee, Mississippi, and South Carolina. Any claim, therefore, by Peters & Co. for contribution from Shaw Brothers, would have been of no avail. And if Shaw Brothers had redeemed from John Shaw, they could have enforced their claim for the full amount paid against the interest of Peters & Co. in the premises, or have acquired a valid indefeasible title thereto.

The case, therefore, is simply this: The assignees for the benefit of all parties interested in the estate, while a bill in equity was pending for the determination of their rights and for a sale of the property, has, with the approval of the court in equity, removed an incumbrance from the property by applying the general funds in their hands to this purpose. The respondents, Peters & Co., would have paid the same amount from their own funds and discharged this incumbrance, if the assignees had failed to do it; and they are the only parties who have profited by the discharge of the incumbrance. The assignees now pray for a return of the amount so paid; and I hold that justice and equity require that the amount should be refunded. And it is so ordered.